WILLIAM YOUNG

*v.*

THE COMMISSIONERS OF HIGHWAYS OF MAQUON TOWNSHIP.

*Filed at Ottawa October 31, 1890.*

1. HIGHWAYS—*mode of improving them—discretion of commissioners.* The manner of improving highways is left principally to the wise discretion of the commissioners of highways; and in the exercise of the duties imposed on them by law they can not be interfered with, unless they invade some private right of a citizen.

2. SAME—*drainage of highways—servient heritage protected.* Where commissioners of highways undertake to drain a public highway, they possess the same rights and are governed by the same rules as adjoining land owners who may undertake to drain their own lands, except where they may proceed under the eminent domain laws of the State.

3. Commissioners of highways, in draining a public road, have no right to divert the water from its natural course and turn it upon the land of another; and if they attempt to do so they may be enjoined by a court of equity, at the suit of the owner of the land on which the water is proposed to be turned.

4. The commissioners have no right or power to collect and carry a quantity of water along a highway which would naturally drain off in another direction, and discharge such accumulated water on the farm of an adjoining land owner; 'nor have they the right to divert water from its regular channel, or place where it would voluntarily flow off, and carry it along the line of the highway in ditches, for such a distance as they may desire, and then discharge it upon the farm of an individual.

5. SURFACE WATERS—*dominant and servient heritage.* The owner of the dominant heritage, or higher tract of land, has the right to have the surface water falling or coming naturally upon his premises, pass off through the natural drains, upon and over the lower or servient lands; and the owner of the dominant heritage may, by ditches or drains, drain his own land into the natural and usual channel, even if the quantity of water thrown upon the servient heritage is thereby increased.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Knox county; the Hon. A. A. SMITH, Judge, presiding.

This was a bill in equity, brought by William Young, to enjoin the commissioners of highways of the town of Maquon, in Knox county, from digging a ditch along the south side of the highway adjoining the lands of the complainant, extending from what is known as the "east Harper drain" to the "west Harper drain," a distance of about forty-five rods, and to restrain them from diverting surface waters from their natural channel, and discharging the same, through the proposed ditch, upon the complainant's lands.

In the original bill complainant alleged that he owned four hundred and forty acres of land on the north side of section 23, Maquon township; that the commissioners of highways propose to cut, and, in fact, have partly cut, a ditch four feet wide and eight feet deep on the road running from Spoon river through

Salem township, in said county, said road running parallel
with said four hundred and forty acres of land owned by your
orator, which said ditch, if made, will drain at least one-third
of Salem township, and throw upon your orator's land said
accumulated water, taking the same out of its natural course,
and inflicting upon your orator's land an unnecessary burden,
and causing to his said premises, by reason of said unnatural
flow of water, a flooding of said premises, and thereby an irre-
parable damage thereto. In an amended bill it was alleged
that Robert Harper owns and occupies as a farm the south-
west quarter of section 14, lying immediately north of the west
part of your orator's land; that between the said land of said
Harper and your orator runs a public highway, extending
directly east past your orator's land and through Salem town-
ship; that no water is precipitated on the surface of the ground
from said public highway, nor from the land of said Harper,
across the public highway aforesaid, upon the land of your
orator, on the surface; that a drain or dry slough, in which
the water does not run upon the surface of the ground, runs
from the roadway aforesaid, at the north or near the center of
your orator's land, in a semi-circular direction, to the north-
ward over the land of said Harper, and running north of Har-
per's house, returning across the highway eight rods from the
north-west corner of your orator's land, thence southward over
your orator's land; that said slough, in which no water ran
on the surface, has been thoroughly tiled by Harper and your
orator. It is also alleged that the public highway has been
so graded and ditched with deep ditches that the surface water
in times of rains and freshets, from the east line of Maquon
township, being one mile east of your orator's north-east cor-
ner, is carried along said highway to your orator's land, while
naturally a large portion of said surface water passed off in
other directions over the adjacent lands; that said ditches
are continued westward by the side of your orator's land, car-
rying said surface water so diverted from its natural course,

along said highway; that prior to the month of May or June last, the water in said ditches was, near the center of the northeast quarter of your orator's land, turned through a culvert or bridge across the public highway, to the north, and thence into a slough running northward and away from your orator's land; that in the month of May or June last, the ditch on the south side of the said public highway, and by said last mentioned bridge, was deepened to about a foot lower than the bottom of the opening under the road under said bridge, so that the water either had, in times of rains or freshets, to stand in the ditch on the road, or make its way in some other direction; that said ditch on the south side of the said highway, being the north side of your orator's land, extends along to where said highway commissioners are intending to make the deep ditch complained of, and that by excavating about a foot in depth for about fifteen rods, said water would all run along said highway to said proposed ditch complained of, and not through said last mentioned bridge, which, since June last up to since the commencing of this suit, has remained with the bottom nearly a foot higher than the bottom of said ditch; that said highway commissioners intended and proposed, after they had excavated the deep ditch complained of, to deepen said ditch, when it was only a foot higher than the bottom of the ditch at the south end of said last mentioned bridge, so that all the water so diverted as aforesaid, and brought from the east line of Maquon township, would, through said deep ditch, be precipitated in time of rain upon your orator's land at the west end of said deep ditch, in a body, when, except in time of extraordinary freshet, no water runs upon the surface of your orator's land; that the natural surface water from the east side of your orator's land, and the land lying east and north of the same, runs away gradually, forming no stream or body of water that interferes with agricultural pursuits or the farming of your orator's land; that the commissioners of Maquon township propose and have partially cut a deep ditch

for the purpose of collecting the surface water from the north and east parts of your orator's land, cutting the ditch several feet in depth through the high land between your orator's and said Harper's land, and discharging the said collected surface water in an unnatural body upon the land of your orator at one place where no water now runs upon the surface. It is also alleged that the digging of the ditch and the discharge of the water will work irreparable injury to orator's lands.

The commissioners of highways put in an answer to the bill, in which they deny that the ditch, as made and as proposed to be made, will drain one-third of Salem township, or that it will throw upon complainant's land any increased or unnatural accumulation of water, or cause irreparable damage to complainant's land, or inflict any unnecessary burden thereon; aver that the ditch is only about one hundred yards in length, and that in its deepest place, when completed, it will not exceed three and one-half feet; deny that said proposed ditch will drain any land or the grade ditch east of the old orchard on complainant's land, which is about sixty yards west of the culvert across said highway, described in said amended bill; deny that they intend said proposed ditch to drain said grade ditch, which now conveys the surface water northward across the highway through said culvert or bridge, or in any way to interfere with such ditch and drainage as they now are; deny that this ditch was dug or intended to connect with or change the surface water northward across the highway, or eastward, in any way to interfere with or change the drainage from what it was before the said ditch was dug, or from what the drainage had theretofore, in a state of nature, been; that the ditch was dug in the performance of their duties as commissioners of highways in said township, and because, in their best judgment, the same was necessary to the proper care and improvement of such highway at that place, and for no other or different reason; deny that they have or intend to enter, with or without force, any lands of complain-

ant to dig any ditch, or for any purpose whatever; deny that the ditch, when dug and completed as contemplated, will cause irreparable or any injury whatever to complainant, as he has alleged, and deny that complainant, upon the case made by his said original and amended bills, was or is entitled to any relief whatever.

A replication having been filed, the cause was heard on the pleadings and evidence, and a decree rendered in favor of complainant. On appeal to the Appellate Court the decree was reversed, and the cause remanded, with directions to dismiss the bill. To reverse the judgment of the Appellate Court the complainant appealed.

Mr. G. W. THOMPSON, and Mr. FLETCHER CARNEY, for the appellant:

The same rules of law are to be applied to road drainage as to farm drainage. *Nevins* v. *Peoria*, 41 Ill. 502; *Tearney* v. *Smith*, 86 id. 391; *Pekin* v. *Brereton*, 67 id. 477.

While the owner of lower lands shall receive all water that naturally flows from the next higher lands, the owner of the higher lands may not open or remove natural barriers, and let on to such lower lands water which would not otherwise naturally flow in that direction. *Anderson* v. *Henderson*, 124 Ill. 164; *Groff* v. *Ankenbrandt*, id. 51; *Peck* v. *Herrington*, 109 id. 611; *Gormley* v. *Sanford*, 52 id. 158.

Messrs. WILLIAMS, LAWRENCE & BANCROFT, and Mr. T. L. McGIRR, for the appellee:

The bill is without equity, on its face. The law permits the owner of the dominant heritage to draw off or turn either surface or flowing water through artificial channels on his own land, upon that of another, at a point where such water "had been wont to flow." *Palmer* v. *O'Donnell*, 15 Bradw. 324; *Peck* v. *Herrington*, 109 Ill. 611; *Dayton* v. *Drainage Comrs.* 128 id. 271.

Per CURIAM: On the hearing a plat was put in evidence, which shows the road in controversy, the owners of lands along the line of the road, the location of the ditch in question, and tending to show the direction in which the surface water naturally flows from the line of the highway. The plat was marked "Exhibit A," and is as follows:

The road shown by the plat is two miles long, running from the south-west corner of the north-west quarter of section 14, and the north-west corner of the north-west quarter of section 23, in Maquon township, to the west line of Salem township. In the spring or early part of the summer of 1887 the commissioners of highways of Maquon township concluded to thoroughly grade and improve the road, and the work was allotted to Arthur Miller, one of the commissioners. In June the work was commenced at the south-west corner of section 14, a point known as the "Harper corners." Miller testified that he began work ninety rods west of Harper's house, graded at the four corners, did some work at the west drain, then scraped the hill between the Harper drains, and then, further east, did work at the Foster culverts, putting dirt between them, and from there to the school house, and from there east, finished the grading as it was intended to be. Along the line of the road the ground was plowed on each side of the road, and the dirt was used to raise the bed of the track, leaving the ditches caused by the excavation to carry off the water along the line of the road. It will be observed that between the east and west Harper drains there is a rise of land or a hill, which is some five feet higher at the highest point on the south side of the road than the natural soil at the east drain. In grading the line of road, in June, this hill or rise was not removed, but remained substantially as it originally existed until about the 5th day of December, when the commissioners commenced cutting a ditch on the south side of the road, to carry the water which might accumulate at the east Harper drain to the west drain; and the evidence shows that it would require a ditch five and six-tenths feet deep at the deepest point, to let the water pass through this rise or hill, in order to drain the east drain and carry the water along the road. The completion of this work complainant sought to enjoin by the bill.

In order to determine whether the complainant has a standing in a court of equity, it will be necessary to go back and examine the evidence in reference to the natural flow of water along the line of the highway. The manner in which the public highways may be improved must necessarily be left, to a great extent, to the mere discretion of the commissioners of highways, and in the exercise of the duties enjoined upon them by law they can not be interfered with, unless they invade some private right of a citizen.

Upon looking into the evidence it will be found that there is no substantial conflict in regard to the natural flow of the surface water on and along the highway. We will, however, refer to the evidence of Prof. Churchill, who does not reside in the neighborhood, and has no feeling or bias in regard to the matters in dispute. The witness made an examination, as he says, to ascertain the drainage of the lands in reference to the road running east and west. He testified: "The road has a gradual fall from Salem township line to Young's west line. There are two drains that cross the road from the north to the south, one in Wasson's place and one at the Cummings place, with natural drainage from north to south, with a fall to the west. In section 13, from a line sixty to eighty rods north of the road, the water naturally flows to the north,—that is, the divide, from which the water runs north and south, is about that far north of the road. Between the school house and the old orchard the land on the south side of the road is higher, and the water makes across the road from section 23 north on to section 14, the natural drainage there being to the north and east on to section 14,—from Mr. Young's land on to Mrs. Foster's land,—through two culverts. Then further west, near Mr. Harper's house, the natural drainage is from south to north across the road in front of Harper's east barn, then around to the north of his house, and back across the road on to the west part of section 23, west of Young's new house."

37—134 ILL.

From the evidence of this witness, who is corroborated by a number of others, and contradicted by none, it appears that · at the east end of the highway the water naturally runs south-west from the highway, crossing the south lane twenty-five rods south, as shown by the plat. About one-half mile further west the water crosses the road again, running south-west. A little further west, at the two Foster drains, as shown on the map, the water crosses the road from south to north, and runs off in a north and westerly direction over the Foster land. Less than a half-mile further west the water again crosses the road from the south to the north at the east Harper drain; and again, near the west part of the road, the water crosses the highway, running south, at what is called the west Harper drain. It is thus plain that there is no natural flow of water at any point from east to west along the highway, but, on the other hand, at six different points in the two mile line of road, the water, when allowed to run as nature had provided it should, will cross the road and run off in a north or south direction. Upon looking at the plat, in connection with the evidence of the witnesses, these six points where the water crosses the road are the following: First, at the south lane, running south-west; second, at the Cummings drain, running south-west; third and fourth, at the two Foster drains, running north; fifth, at the east Harper drain, running north; sixth, at the west Harper drain, running south. Has the water been diverted from its natural channel, and forced by the commissioners to run in another direction?

As to the south lane, Churchill, in his evidence, says: "Without the ditch," (meaning the ditch twenty-five rods long on the east side of the south lane, constructed to run the water north into the highway,) "and left alone, the water would flow south from the east and west roads, across the McCoy land, to the south and south-west." As to the water at the Cummings drain the witness said: "At the Cummings land there is a drain which should take the water from section 13 across the

east and west road on to section 24, to the south-west, and across the north and south road, following the natural drainage; but the ditch on the south side of the east and west road, as now constructed, is sufficient to carry this water, which should naturally run upon and across the Cummings forty, west to the culvert in the east and west road ditch across the north and south road, so that the water runs west there. This Cummings drain is twelve or fourteen rods from the intersection of the roads. The ditch is about two feet deep west of this culvert, where these roads cross each other. A ditch a trifle over a foot deep would carry the water from the Cummings culvert west to the intersection of the two roads, and the ditch is almost two feet deep." At the intersection of the two roads the witness finds the ditch two feet deep, and at that point he says the water which would naturally run across the Cummings forty runs west along the east and west road towards Harper's. At the Foster drains, where the water naturally runs north over the Foster land, the ditch on the south side of the road was made some nine inches deep, and the center of the road is about two and three-tenths feet above the bottom of the ditch, so that the water coming from the Cummings drain down the road was prevented from going north over the Foster land. However, it appears from the evidence, a short distance west of the west Foster drain there is a rise in the land at or near a point called "old orchard." There the ditch is from eight to ten inches deep on the south side of the road, but, according to Churchill's evidence, the bottom of the ditch at this point is six inches higher than the bottom of the ditch at the west Foster culvert, and he says that the ditch would not have to be lowered more than six inches to enable the water to run west past the old orchard, and into the east Harper drain. That it was the intention to run the water west along the entire line of road is, however, manifest from the evidence of Miller and B. F. Foster.

In speaking of the water at the south lane and at the Cummings drain, commissioner Miller, on his cross-examination, said: "I knew of the complaints about the water being turned, at the time I changed this culvert at the south lane. We carried the water west, instead of allowing it to run across Cummings, because Cummings objected. He said he would spend $300 if we run it across him. That is where the water belonged." From this evidence it appears that Cummings would not allow the water coming from the east, out of its natural course, to be turned on to him; and when the Foster drains are reached, still further west, we find the same objection, and to avoid trouble the water had to be carried on further west.

B. F. Foster testified: "I reside about one hundred and twenty rods north of the school house, on the south-east quarter of section 14, on which my mother owns the land along this east and west road, opposite Young's, from the school house west to the old orchard. I had a talk with Mr. Miller, one of the road commissioners, in May, 1887, the substance of which was: Mr. Miller asked me if mother was objecting to them draining the water there, and I told him if they turned this water that did not belong there, on us, I thought there would be objections, and he said it was not the intention to turn the water which did not belong there, on mother's land,— that he intended to run these ditches on each side of the road grade, clear to the Salem township line, and run this water west to the drain west of Harper's."

After passing the Foster drains, the next point reached is the east Harper drain. Here the culvert had been removed, and the water could not pass over on Harper's land. If an effort had been made to turn the water coming down the road from the east, upon Harper, doubtless the same objection would have been made that had been interposed by Mrs. Foster and Cummings. But the plan adopted did not contemplate turning the water on Harper's land, but the understanding

was, to cut a ditch from the east to the west Harper drain, along the south side of the road, of sufficient capacity to carry the water coming down the road from the east to the west Harper drain. There the water was to be deposited, regardless of consequences.

From an examination of the evidence but one conclusion can be reached, and that is, that the commissioners of highways have diverted the water from its natural course, and turned it upon the land of complainant. Does the law authorize this action? The commissioners of highways, where they undertake to drain a public highway, possess the same rights, and are to be governed by the same rules, as adjoining land owners who may undertake to drain their own lands, except where they may be proceeding under the eminent domain laws of the State.

In *Peck* v. *Herrington,* 109 Ill. 611, we had occasion to consider the rights and duties of adjoining land owners, and the rules that should govern them in draining their lands, and among other things it was there held: "The owner of the dominant heritage or higher tract of land has the right to have the surface water falling or coming naturally upon his premises, pass off the same, through the natural drains, upon and over the lower or servient lands; and the owner of the dominant heritage may, by ditches or drains, drain his own land into the natural and usual channel, even if the quantity of water thrown upon the servient heritage is thereby increased."

Under the rule established in this case, it seems plain that where water accumulating in a particular part of a highway will naturally run off in a certain channel or water-way, all that portion of the highway which lies in such a position as to naturally drain in that direction may be drained in such channel, although the flow of water may be increased. But the commissioners have no right or power to collect and carry a quantity of water along the highway which would naturally

drain off in another direction, and discharge such accumulated water on the farm of an adjoining land owner. Nor have the commissioners the right to divert water from its regular channel, or place where it would naturally flow off, and carry it along the line of the highway, in ditches, for such a distance as they may desire or think proper, and then discharge that water upon the farm of a land owner. This would be imposing a burden upon the land owner, which the law will not tolerate. Cases may arise where the commissioners might, no doubt, if they saw proper, divert the water along the highway, from its natural flow, and carry it along the line of road, to be discharged into some large stream of water which might cross the highway. In the case under consideration, had there been a large stream of water crossing the highway where the commissioners proposed to discharge the water, doubtless they might, had they thought it for the best interests of the district, have conducted the water from the Wasson land and other points, along the line of the highway, and discharged it into such stream, as such a course would have resulted in no damage to the adjoining land owners. But such was not this case. Here, the water is diverted from its natural channel, carried along the line of the highway for a long distance, and then discharged on the highway in such manner as to spread over the lands of the complainant. The land owner can not be subjected to a burden of this character without a remedy.

We think the judgment of the Appellate Court was erroneous. It will be reversed, and the decree of the circuit court will be affirmed.

*Judgment reversed.*