City of Peru, et al., Plaintiffs-Appellants, v. City of LaSalle, et al., Defendants-Appellees.

Gen. No. 69–34.

Third District.

February 9, 1970.

Louis Olivero, of Peru, for appellants.

J. Paul Aplington and J. D. Hurley, Jr., of LaSalle, for appellees.

PER CURIAM.

The cause before us originated as an action for injunction instituted by the City of Peru to restrain the City of LaSalle from draining water through a storm drain from the city limits of the City of LaSalle into a ravine which ultimately drained onto property be-

longing to the City of Peru. At the close of all the evidence offered for plaintiff, the court entered an order dismissing plaintiff's complaint. Plaintiff City of Peru has appealed.

On appeal in this Court the City of Peru contends (1) that there must be a natural watercourse on land in LaSalle (as the dominant owner) which drains the dominant land onto the servient land of Peru at a particular point, and that in absence of such natural watercourse, defendant does not have the right to drain its land through the drain tile onto the land owned by the City of Peru; and (2) that because a combined storm and sanitary sewer system of the City of LaSalle has carried a substantial part of the storm water from the disputed area to the east rather than allowing it to go west to the City of Peru, for a period of more than 20 years, an easement by prescription was thereby created, or that an estoppel arises in favor of the City of Peru to prevent such water which has been diverted to the east for such period, to now be diverted and cast upon the land owned by the City of Peru.

The area in question is located within the City of LaSalle and was developed for urban purposes since 1906. In the course of the development of this land the City of LaSalle has constructed combined drains in the sanitary sewer system to also collect and dispose of storm water in the area. Five witnesses testified for the plaintiff as to the history of the water disposal in the City of LaSalle in the area. The disputed area is bound on the north by Gunn Avenue, on the east by Creve Coeur Street, on the south by Eleventh Street in LaSalle (called Shooting Park Road in Peru) and on the west by Chartres Street. The area comprises about 3 acres.

A Mr. Pattelli, Superintendent of Public Works in LaSalle, who has lived in the area for 18 years, testi-

fied that the combination storm and sanitary sewers of the City of LaSalle carry the water in an easterly direction away from Peru. He also testified that he never observed a draw going toward the west. The mayor of Peru, Donald Baker, testified that he had never seen a natural watercourse in the area in question. Henry Mayer, a civil engineer, testified that he did not observe any watercourse in the area under dispute. Mr. Mayer also testified that the contour map introduced in evidence showed the area as being flat. Exhibits admitted into evidence showed combination storm sewers flowing in a southeasterly direction across the area referred to. There was no showing of any combination sewer in the City of LaSalle which had an outlet onto property in the City of Peru. Mr. Mayer also testified that he observed no natural watercourse draining water from LaSalle to Peru.

The mayor of LaSalle, a Mr. Gunia, testified that in 23 years as an alderman he knew of no storm sewer that discharged LaSalle water onto any property located in Peru. Mr. Rummens, Director of Public Works for the City of Peru, testified that in his opinion there was no natural watercourse in the area bounded by the streets referred to in LaSalle. It was also indicated that the City of LaSalle combined storm and sanitary sewers were not able to carry all the surface and storm water whenever there is a rain of one-half inch or more; that the City of LaSalle sewer system does not carry all the surface water in the area in question.

Mr. Mayer, the civil engineer, testified, however, that the natural flow of surface water in the area being drained, was to the ravine in the City of Peru. The mayor of Peru, on cross-examination, also stated that the water falling in the area in question would naturally flow west to the ravine. Mr. Pattelli also testified that there was a sewer inlet on the west borderline of LaSalle which emptied into the ravine in Peru.

214

He also stated that during a rain of over one-half inch, the water runs through a watercourse in the area in question to the south side of Eleventh Street in LaSalle and, eventually, into the ravine in Peru. The testimony of Mr. Mayer was to the effect that water which falls in the area bounded by the four streets referred to, would naturally find its way to the ravine in the City of Peru as part of the "watershed" draining into the ravine. He defined a "watershed" as being "an area of tributary from which the water would run off to a particular point." He testified, however, that there was no defined watercourse across the area in question.

Although it was not clear as to the ultimate purpose of the LaSalle 30-inch tile, it appeared that the 30-inch tile drain of LaSalle was designed to empty into a creek in the ravine which went into the City of Peru. The point where the tile would empty is not owned by the City of Peru but the creek in the ravine would eventually flow through land owned by the City of Peru. At the close of the evidence for plaintiff, defendant moved to dismiss the plaintiff's complaint and this motion was granted.

It is apparent from the record that the land in the City of LaSalle would ordinarily be the dominant land that would drain into the ditch which traversed the City of Peru. Both parties agree that the early Illinois case of Peck v. Herrington, 109 Ill 611, is one of the leading cases on the question of surface drainage. In that case, Peck owned the higher land and put in a tile to drain a pond on his higher land into a natural watercourse on his land which eventually flowed onto plaintiff's land. The court of review described the problem as follows (at page 617):

> "It also appears, from the evidence, that the tile-drain which Peck proposed to put in when the in-

215

junction was served, extended from 'A' to 'C,' where the water would be discharged in the natural channel where the surface water had run for many years. The point 'C,' which appellant designed as the outlet for the tile-drain, was on his own land, and a distance of more than a half-mile from Herrington's land. Under such circumstances, did appellant Peck have the right to tile-drain the ponds, and turn the water therein in the channel which had for a number of years carried off the surface water?"

The court further stated (at page 618):

"We now come to the main question in the case. Had Peck the right to drain the water from the ponds and discharge the same on his own land in the channel which carried the surface water from his land to that owned by Herrington?"

The court allowed Peck to drain his land upon the land of the servient owner and stated (at page 619):

"It may also be regarded as a well-settled rule that the owner of the upper field cannot construct drains or ditches so as to create new channels for water in the lower field, but he may make such drains, for agricultural purposes, on his own land, as may be required by good husbandry, although by so doing the flow of water may be increased in a regular, well-defined channel, which carries water from the upper to the lower field.

. . . . . .

". . . we are of the opinion that he had the right to tile-drain the ponds, and carry off the water in the natural channel leading from 'A' to 'I,' although the flow of water would thereby be increased. . . .

216

". . . and so long as the water was discharged in the regular channel leading from the land of Peck to that of Herrington, he has no legal ground of complaint. The natural flow of the surface water was not changed by the drainage. It may have been increased, but such increase of water was a burden which the location of the two tracts of land demanded should be borne by the owner of the lower tract of land."

The rules with respect to drainage established at common law and specified in the case of Peck v. Herrington, supra, have not been changed by the applicable Illinois statute (1967 Ill Rev Stats, c 42, § 2–1), which provides "Land may be drained in the general course of natural drainage by either open or covered drains. When such a drain is entirely upon the land of the owner constructing the drain, he shall not be liable in damages therefor." In the case of Lambert v. Alcorn, 144 Ill 313, 33 NE 53, the court stated (at page 327):

"Since the decision by this court of the case of Peck v. Herrington, the Legislature has enacted a law, embodying substantially, in statutory form, the rule established in that case."

It is contended, however, by plaintiffs in this cause, that the dominant owner under Illinois law may only lay artificial tile lines on such dominant property and collect water by tiles and drains if there is a natural watercourse on the dominant land, which natural watercourse empties into the servient land. Plaintiff asserts that there is no such watercourse in the cause before us. Defendant contends that it is not important to show a natural watercourse existing on the dominant land.

In discussing what is a natural watercourse, the court in Lambert v. Alcorn, 144 Ill 313, 33 NE 53, at 324, stated:

217

"If the conformation of the land is such as to give to the surface water flowing from one tract to the other a fixed and determinate course, so as to uniformly discharge it upon the servient tract at a fixed and definite point, the course thus uniformly followed by the water in its flow, is a watercourse, within the meaning of the rule applicable to that subject. Doubtless such watercourse can exist only where there is a ravine, swale or depression of greater or less depth, and extending from one tract onto the other, and so situated as to gather up the surface water falling upon the dominant tract and to conduct it along a defined course to a definite point of discharge upon the servient tract. But it does not seem to be important that the force of the water flowing from one tract to the other has not been sufficient to wear out a channel or canal having definite and well marked sides or banks. That depends upon the nature of the soil and the force and rapidity of the flow. If the surface water in fact uniformly or habitually flows off over a given course, having reasonable limits as to width, the line of its flow is, within the meaning of the law applicable to the discharge of surface water, a watercourse."

In Montgomery v. Downey, 17 Ill2d 451, 162 NE2d 6, where the court allowed the dominant landowner to change the channel on his land, the court cautioned (at page 461) :

". . . provided, of course, that in making the change he does not cast upon the lands of an adjoining proprietor water which did not in the natural course of drainage flow upon such adjoining premises."

 An attempt was made by plaintiff to establish that the City of LaSalle had drained surface water

in the area in dispute through the city sewers which had been in existence for many years and that these sewers carried the waters in an easterly direction rather than in a westerly direction toward the City of Peru. Plaintiff contends that such activity for many years should prevent the City of LaSalle from now diverting water to the west on an estoppel theory. It appears, however, that what plaintiff is really attempting to argue is that the City of Peru has obtained what amounts to a prescriptive right or equitable right not to have water from the City of LaSalle (which had been diverted for such a long period of time in an easterly direction) to now be cast upon the City of Peru, even though the natural flow of surface water is from La Salle to Peru. Such prescriptive right has been recognized by the Illinois courts for many years. In Montgomery v. Downey, 17 Ill2d 451, 162 NE2d 6, the court stated (at page 458):

> "It has long been settled in this State that the owner of land which by reason of its elevation is servient to, and provides natural drainage for, the surface waters of higher lands may, by prescription, obtain an easement to free his land of the natural burden. Thus, as to surface water drainage, it may be said that the dominant land has a benefit and the servient land a burden and that, by the construction of a levee or other barrier to the natural drainage, the owner of the servient land may, if such obstruction is maintained for the prescriptive period, reverse the benefit and burden situation in that the servient land becomes benefited by being kept free of surface waters, and those waters are backed up upon the dominant land, thereby burdening it."

Other cases supporting such principle are Beechley v. Harms, 332 Ill 185, 163 NE 387; Broadwell Special Drain.

Dist. No. 1 v. Lawrence, 231 Ill 86, 83 NE 104. Since both parties are municipalities, they would stand respectively in the same position on this issue as if they were nonpublic entities (Elser v. Village of Gross Point, 223 Ill 230, 242, 79 NE 27; City of Northlake v. City of Elmhurst, 41 Ill App2d 190, 190 NE2d 375).

■ In a municipal area surface water may be gathered, in absence of a physical watercourse, but such surface water can only be delivered to a point where in the state of nature it would have found its way down to the servient land. When an area is subdivided or improved with houses or streets, the original conformation of the land may be changed, but if surface water flowing in the area is still drained into the same point of discharge where it would normally have found its way, the servient landowner cannot complain.

In the light of our observations (referring to drainage rights as limited by possible prescriptive rights), we do not find in the record any specific indication as to whether or not the existing combined sewer and storm water system was to be abandoned by the City of LaSalle nor does the record clearly indicate how much water, which would flow from the area in question, was in fact carried by the existing sewer system. The record also fails to disclose the purpose of the 30-inch drain referred to or the nature of storm water flow of water into the drainage ditch which goes through the City of Peru. The record likewise does not disclose how much usage or drainage of surface water was in fact handled by the combined storm and sewer system, but indicates only in general terms, that there was such diversion, and that when there was over $\frac{1}{2}$ inch of rain the surface water would follow a natural course into the ditch and through the City of Peru.

■■ On the basis of the record, therefore, we must conclude that the trial court correctly refused to grant

injunctive relief. Nothing herein contained, however, should be construed as determining whether or not the City of Peru has acquired any prescriptive rights by reason of the diversion of the drainage waters through the storm and sewer system. Such prescriptive rights would be limited to the amount of diversion which had actually been established and not involve surface water which would not have been so diverted. We likewise have not made a determination as to possible obligations of the City of LaSalle with respect to maintenance in the event of clogging, etc. of the drainage ditch in the City of Peru as such problems may develop (Savoie v. Town of Bourbonnais, 339 Ill App 551, 559, 90 NE2d 645). When, as and if the problems herein referred to actually arise, or are established of record, a trial court will be in position to dispose of the issues on the basis of a specific showing of damage or potential damage or of the mutual or respective equitable rights to usage or protection from excessive usage as between the two municipalities.

Since the record failed specifically to show a right to injunctive relief at the time of hearing of this cause, we conclude that the order of the Circuit Court of LaSalle County was not improper. Such decree will, therefore, be affirmed.

Affirmed.