BERTRAM F. TEMPLETON, Plaintiff-Appellant, *v.* JACK C. HUSS *et al.*, Defendants-Appellees.

(No. 11749; ■■■

Fourth District—January 31, 1973.

830

Phillips, Phebus, Tummelson & Bryan, of Urbana, (Joseph W. Phebus and E. Phillips Knox, of counsel,) for appellant.

Webber, Welsh & Kehart, and Josisch & Patton, both of Decatur, (Richard J. Welsh, Edwin W. Jokisch, Jr., and Jerry L. Patton, of counsel,) for appellees.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

The plaintiff, Bertram F. Templeton, is the owner of certain farm land located near Oreana, Illinois. This property is south and southwest of acreage owned by the defendants, Huss and Oldweiler. Huss and Oldweiler (hereinafter referred to as subdividers) subdivided their property and between June, 1961, and November, 1964, three separate additions were laid out and the plats thereof approved and accepted by the Village of Oreana. These three additions contained a total of 114 houses by the date of trial including two that were only partially constructed. Various streets and driveways were laid out by the subdividers' engineer, Warren Hagan, and duly constructed.

On November 5, 1964, the plaintiff filed this action against the subdividers and their wives. The complaint alleged that in constructing their subdivision Huss and Oldweiler had changed the natural course of the surface drainage with the result that water from a different watershed was brought into the natural watershed in which plaintiff's land was located all to the damage of the plaintiff. The plaintiff initially sought a permanent injunction against the subdividers and, by later amendment, also requested damages. In 1967, the plaintiff filed Count II directed against the Village of Oreana. This count alleged the construction of the subdivision and the acceptance and approval of all of the subdivision plats by Oreana together with the dedication by the subdividers of the streets and catch basins to the public. Plaintiff then alleged facts similar to those in Count I to the effect that in the construction of the subdivision

the natural drainage flow was altered to the damage of plaintiff's property. A permanent injunction was prayed for against the Village.

Finally, in January, 1971, the plaintiff filed another Amended Complaint adding, in part, Counts III and IV. Count III was directed against the subdividers and charged that in the construction of the subdivision the condition of the land was altered in such a fashion that water flowed onto plaintiff's land at a greater rate and in a greater amount than it did in the course of nature. Count IV was against the Village and was couched in similar terms including, of course, the fact that the plats of the subdivision were approved and accepted by the Village. Both Counts prayed for a permanent injunction and money damages. Neither Count alleged that the natural surface drainage of the subdivision land had been altered or diverted. They simply declared that the subdividers "altered the condition of the land" so that water flowed onto plaintiff's land at a greater rate and in greater amounts than in the natural course of drainage. Prior to trial, the Court dismissed Counts III and IV for failing to state a cause of action. This dismissal was predicated upon the failure of each Count to allege that "water was directed from its natural source or outlet or flowed other than in the general course of natural drainage."

The case proceeding to trial on the remaining Counts of the Complaint and at the end of all the evidence the trial court ruled in favor of all the defendants and entered judgment against the plaintiff on Counts I and II. This appeal has been taken from those judgments and also from the order of the trial court dismissing Counts III and IV. We shall first consider the action of the trial court in entering judgment against the plaintiff and in favor of the defendants on Counts I and I.

The cause of action presented by these two counts is a classic one. In essence these counts sought an injunction and damages for an alleged diversion of the natural drainage of surface water. The plaintiff charged that during the construction of their subdivision the defendants Huss and Oldweiler changed the course of natural drainage by bringing water from a different watershed into the natural drainage system that drained both the plaintiff's and the defendants' lands. Because of this change or diversion the plaintiff claimed that his land received greater quantities of water than it did in the course of nature. It is undisputed in the record that, as to surface drainage, the defendants' subdivision land was the dominant tract and the plaintiff's land was the servient tract.

■■ The various legal theories relative to the drainage of surface water were summarized by the Court in *Mello v. Lepisto* (1966), 77 Ill.App.2d 399, 401-02, 222 N.E.2d 543, as follows:

"There are three legal theories of drainage in the United States.

The first is the so-called 'common enemy doctrine' which permits an owner of land to repel drainage waters in any manner he chooses. This rule is not the law in Illinois. The second legal theory is the so-called 'civil law rule', which requires the owner of servient lands to accept all waters naturally flowing from dominant lands. This is the rule of drainage law in Illinois. The third theory is the so-called 'reasonable use' theory which modified the civil law rule in the case of urban lands.

The civil law rule was first adopted in the State of Louisiana in the case of Orleans Navigation Co. v. Mayor of New Orleans, 1 La. 73, 2 Mart (OS) 214. Pennsylvania was the first common law State to adopt the rule in the case of Martin v. Riddle (1848), 26 PA 415. The rule was adopted by Illinois in Laney v. Jasper (1865), 39 Ill. 46 and more adequately expressed in Gillham v. Madison County R.R. Co. (1869), 49 Ill. 484. In Gormley v. Sanford (1869), 52 Ill. 158, a classic statement of the rule is made at page 162:

'* * * As water must flow, and some rule in regard to it must be established where land is held under the artificial titles created by human law, there can clearly be no other rule at once so equitable and so easy of application as that which enforces natural laws. There is no surprise or hardship in this, for each successive owner takes with whatever advantages or inconveniences nature has stamped upon his land.'

These early decisions have been followed by many later cases, among them, Adams v. Abel, 290 Ill. 496, 125 N.E. 320; (1919); and Geis v. Rohrer, 12 Ill.2d 133, 145 N.E.2d 596 (1957)."

█ █ Therefore, in this case the plaintiff, as owner of the servient tract, was required to accept all water naturally flowing to him from the defendants' subdivision. He was not, however, required to accept water flowing from the dominant tract that would not ordinarily do so in the course of nature. The owner of a dominant tract cannot divert or change the natural course of drainage to bring water in from another watershed nor can he "remove natural barriers" and let on to the servient land "water that would not otherwise naturally flow in that direction". *Anderson v. Henderson* (1888), 124 Ill. 164, 170, 16 N.E. 232; see also *Daum v. Cooper* (1904), 208 Ill. 391, 397-98, 70 N.E. 339; *Elliott v. Nordlof* (1967), 83 Ill.App.2d 279, 227 N.E.2d 547.

█ █ The liability of the Village of Oreana was properly predicated upon its approval and acceptance of the plats submitted by the defendant subdividers. Once those plats were accepted and recorded the Village "then had exclusive control of the streets and surface water drains and

any injunctive relief granted by the trial court against defendants, 'other than the Village', would have been meaningless and of no avail". (*Elliott v. Nordlof* (1967), 83 Ill.App.2d 279, 281-82, 227 N.E.2d 547.) The question raised by Counts I and II was therefore a factual one: in the construction of their subdivision did the defendants Huss and Oldweiler change the natural courses of surface water drainage so as to bring water from another watershed into the natural drainage course and onto the plaintiff's land? The trial court held that the plaintiff had not established such a diversion. We concur.

The following sketch portrays the relative position of the parties' land holdings. The area labelled "West Plains Subdivision" is owned by the defendants Huss and Oldweiler and the large area marked "Templeton" belongs to the plaintiff:

The principal contention of the plaintiff relative to diversion concerned five to ten acres of land in the northeast corner of the subdivision. Plaintiff maintained that, prior to the construction of the subdivision, water in that particular area would flow northeast to the corner of S. A. 20 and View Street and either pond or flow to the west along the drainage ditch on the south side of S. A. 20. If the water became deep enough or, in the instance of very heavy rains, the water would crest and flow to the east across View Street. The defendants asserted that except for a very small portion at the north end of the subdivision that drained north, the natural drainage was to the southwest.

In support of his assertion the plaintiff produced a number of lay witnesses who testified, in general, that prior to the construction of the subdivision they observed ponding in the northeast corner of the subdivision acreage and that the water in this area generally flowed northeast to the corner. In times of very heavy or unusual rain the water would crest View Street and flow to the east. Farmers who worked the plaintiff's land for him testified that prior to the construction of the subdivision they had very little problems with flooding and water damage to the plaintiff's crops but that after the subdivision was erected they experienced flooding and resultant crop damage.

The testimony of these lay witnesses with respect to the surface drainage of the subdivision land was based upon their visual observations either from being on the land itself or from simply driving by it from time to time. The value of their testimony was seriously undermined by one of the plaintiff's own experts, Charles Danner, who testified that the land was fairly level to the naked eye and that it would be difficult for an untrained person to tell the slope of the land without some type of measuring device. This fact was confirmed by the professional engineer and surveyor who platted the defendants' subdivision, Warren Hagan, who stated that the fall or slope of the ground was generally not visible to the naked eye except in certain specific areas where there was an obvious fall.

The principal area of disagreement between the parties at trial was over a topographical map prepared by engineer Warren Hagan showing the various contours of the land in question. This map was prepared by Hagan for the subdividers in 1961, prior to the construction of the subdivision. To prepare a map with a one foot contour level Hagan's employees took measurements or "shots" 300 feet apart in a grid pattern unless there was a break in the ground in which case a measurement would be taken at that point. Hagan observed the land, then took the data supplied by the grid measurements and prepared a contour map of the area. The expert testimony presented by both sides acknowledged

that in the preparation of a contour map the actual drawing of the contour lines depends to some extent on the skill and expertise of the person making the drawing. Hence, given identical grid measurments two different map makers could prepare a topographical map with different contour lines.

As we have noted, Warren Hagan was the engineer who prepared the original contour map and platted the subdivision for the defendants Huss and Oldweiler. Called as a defense witness, he testified that in his expert opinion the natural course of surface drainage before the erection of the subdivision was to the southwest through the subdividers' land and onto plaintiff's property. He further stated that the present course of drainage from the area in question was to the southwest and that "the street pattern is laid out in such a manner that \* \* \* water will flow with the slope of the streets and go in a southwesterly direction following the natural drainage pattern of the land".

Hagan's map and testimony were disputed by the plaintiff's experts, Charles Danner and John Goodell. Both of these witnesses claimed that the measurements taken by Hagan's employees were not dense enough to compile an accurate one foot contour map. Both testified that the natural course of surface water drainage prior to the subdivision was not to the southwest but, instead, was to the north and east. Danner, however, admitted that he did not dispute the measurements Hagan relied upon but only the conclusions Hagan drew from the measurements in preparing his contour map. Danner made some field measurements of his own and drew another contour map for the south portion of the subdivision land. This map had little or no relevance to the question of diversion in the five to ten acre area in the northeast corner of the subdivision.

The testimony of Goodell was questionable. He objected to the contour map drawn by Hagan on the ground that the measurements Hagan relied upon were too sparse to "accurately reflect the terrain" and that "four and nine times as many shots or points [should have been] taken as were actually taken." Two days prior to his testimony Goodell prepared his own contour map of the subdivision land that he testified extensively from at the trial and maintained that it showed a "saddle" or "ridge" in the northeast area that caused the natural flow of surface drainage to be to the north east. However, in drawing his contour map Goodell used Hagan's allegedly "unreliable" measurements. The only difference, therefore, between the map prepared by Hagan and the map prepared by Goodell was their individual, professional differences in drawing contour lines. Each relied upon identical data but arrived at different professional conclusions.

Goodell also testified at great length about an elevation map he pre-

pared in an exaggerated form to show the rise in the land in the northeast corner. Again, his data for this map was the Hagan measurements. Unfortunately, he misinterpreted the Hagan data and took as one of his elevation points a measurement shot that had actually been taken in the bottom of a drainage ditch.

■■ This case was heard by the court below without a jury. We are mindful that the findings of the trial judge are not to be disturbed unless clearly against the manifest weight of the evidence. (*Geis v. Rohrer* (1957), 12 Ill.2d 133, 136, 145 N.E.2d 596; *Sohio Corp. v. Gudder,* 375 Ill. 622, 627, 32 N.E.2d 148; *Croft v. Lamkin,* 112 Ill.App.2d 321, 327, 328, 251 N.E.2d 88.) The plaintiff in this case has not requested a reversal on the ground that the ruling of the trial court was against the manifest weight of the evidence. Instead, although admitting such cases are "rare", plaintiff has requested not only that the trial court be reversed but that we enter a judgment in his favor as a matter of law. Plaintiff maintains that even viewing all of the evidence in its aspects most favorable to the defendants the evidence so overwhelmingly favors the plaintiff that no contrary judgment could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 229 N.E.2d 504.) This we cannot do. The decision of the trial court was not against the manifest weight of the evidence. The judgments in favor of the defendants on Counts I and II of the complaint are affirmed.

We now turn to the second question raised by this appeal, whether the trial court erred in dismissing Counts III and IV of the complaint. These two counts sought an injunction and money damages from the subdividers and the Village on the theory that in constructing the subdivision the condition of the land was altered so that both the quantity and rate of water flow across the plaintiff's land was increased. It is important to first note what these counts did *not* allege. They did not allege that there had been a diversion of the natural course of surface water drainage. They did not allege that in the construction of their subdivision the defendants Huss and Oldweiler had brought water from another watershed into the natural course of drainage across plaintiff's land. They did not allege that water entered the plaintiff's land at any point other than the point where it would normally enter in the natural course of drainage.

■■ The question we are called upon to decide is a narrow one: does the owner of servient land have a cause of action against the owners of a dominant tract who subdivide their land and in so doing alter its condition in such a manner that water, in the natural course of surface drainage, flows on to the servient tract at an increased rate and in greater quantities? The court below held that the servient owner did not have a cause of action under those circumstances. We agree.

The law in this State for over seventy-five years has held that the owner of a dominant tract can drain his land in the course of agricultural husbandry through the natural course of surface water drainage even, if in so doing, the rate of flow to the servient acreage is increased. (*Peck v. Herrington* (1884), 109 Ill. 611, 619.) In *Peck* the plaintiff was the owner of a servient tract who brought an action to enjoin the defendants from draining certain sloughs or small ponds on their land. The evidence disclosed that the defendants had dug ditches and laid tile to drain some small ponds and that the water from these drains was discharged into the *natural* course of surface water drainage and eventually onto the property of the plaintiff. The main question in the case was whether the defendant Peck had "the right to drain the water from the ponds and discharge the same on his own land in the channel which carried the surface water from his land to that owned by" the plaintiff. *Peck, supra,* at 618.

The Court held that the defendant did have such a right and that the plaintiff was not entitled to an injunction even though the rate of water flow across the plaintiff's land was increased. After stating the "well settled principle of law, that where two farms adjoin, and one lies lower than the other, the lower farm will be subject to the natural flow of water from the one which lies in a more elevated position" (*Peck, supra,* at 618-19), the Court declared that:

> "It may also be regarded as a well settled rule that the owner of the upper field can not construct drains or ditches so as to create new channels for water in the lower field, but he may make such drains, for agricultural purposes, on his own land, as may be required by good husbandry, although by so doing the flow of water may be increased in a regular, well-defined channel, which carries the water from the upper to the lower field." *Peck, supra,* at 619.

The court then went on to state that the defendant, owner of the dominant tract,

> "* * * had the right to tile-drain the ponds, and carry off the water in the natural channel * * * although the flow of water would thereby be increased * * *.
>
> It may be true that the owner of a tract of land would have no right to drain a lake or large body of water upon the land of an adjoining owner, and thus destroy it; but such is not this case. These small ponds rendered much of the land of Peck unfit for cultivation, and good husbandry required that they should be drained, and so long as the water was discharged in the regular channel leading from the land of Peck to that of Herrington, he has no legal ground of complaint. *The natural flow of the surface*

*water was not changed by the drainage. It may have been increased, but such increase of water was a burden which the location of the two tracts of land demanded should be borne by the owner of the lower tract of land."* Peck, supra, at 620. (Emphasis added.)

The rule enunciated by the court in *Peck* has been followed in many subsequent cases. For example, in *Anderson v. Henderson* (1888), 124 Ill. 164, 170, 16 N.E. 232, the court remarked that "the law * * * is so well understood it need not be discussed," and then went on to state that:

"It is, that the owner of a higher tract of land has the right to have the surface water falling or coming naturally upon his premises by rains or melting snow, pass off the same through the natural drains upon or over the lower or servient lands next adjoining, and the owner of the dominant heritage has, and ought to have, the right, by ditches and drains, to drain his own land into the natural and usual channels which nature has provided, even if the quantity of water in that way thrown upon the next adjoining lower lands by thereby increased. The rule in this respect is a just one, and is indispensable to secure proper drainage, in many instances necessary to render land tillable. While the owner of lower lands shall receive all water that naturally flows from the next higher lands, the owner of the higher lands may not open or remove natural barriers, and let onto such lower lands water that would not otherwise naturally flow in that direction. That would be to subject the servient heritage to an unreasonable burden, which the law will not permit, and against which the owner ought reasonably to have protection."

Statements of this rule, often in identical language, can be found in *Dayton v. Drainage Commrs.* (1889), 128 Ill. 271, 276-77, 21 N.E. 198; *Kankakee Drainage District v. Commissioners of Lake Fork Drainage District* (1889), 130 Ill. 261, 265-66, 22 N.E. 607; *Young v. Commissioners of Highways of Maquon Township* (1890), 134 Ill. 569, 581, 25 N.E. 689; *Lambert v. Alcorn* (1893), 144 Ill. 313, 326, 33 N.E. 53; *Fenton & Thompson R.R. Co. v. Adams* (1906), 221 Ill. 201, 211-13, 77 N.E. 531; *Broadwell Drainage District v. Lawrence* (1907), 231 Ill. 86, 96-97, 83 N.E. 104; *City of Peru v. City of La Salle* (1970), 119 Ill.App.2d 211, 215-17, 255 N.E.2d 502.

■■ Subsequent to the decision in *Peck*, in 1885 the legislature enacted the predecessor of the statute now found in Ch. 42, Sec. 2—1 of the Illinois Revised Statutes. The latter statute provides as follows: "Land may be drained in the general course of natural drainage by either open

or covered drains. When such a drain is entirely upon the land of the owner constructing the drain, he shall not be liable in damages therefor." This statute is simply a codification of the principle laid down in *Peck*. *Lambert v. Alcorn* (1893), 144 Ill. 313, 327-28, 33 N.E. 53; *Broadwell Drainage District v. Lawrence* (1907), 231 Ill. 86, 97, 83 N.E. 104; *City of Peru v. City of La Salle* (1970), 119 Ill.App.2d 211, 217, 255 N.E.2d 502.

*Fenton & Thompson R.R. Co. v. Adams* (1906), 221 Ill. 201, 77 N.E. 531, is an application of the rule announced in *Peck* to facts which are quite analogous to the present case. The defendants in *Fenton* were the owners of property that had a ravine located on it. This ravine ran generally north by northwest and drained into a large basin on the defendants' lands. The natural course of surface water drainage was then out of this basin and in a southerly direction across the defendants' property and onto property owned by the plaintiffs. The right of way of the Fenton & Thompson Railroad cut across the southwest corner of the defendants' property and the other plaintiffs were the owners of property lying west of the right of way onto which this natural water course drained.

The defendants proposed to dig a ditch from the ravine on their property west to connect up with the natural drainage route. This ditch was located solely on the defendants' property and when completed would empty into the natural course of surface water drainage approximately twenty-three rods from the railroad's right of way. The action filed by the railroad and the property owners to the west of the railroad sought to permanently enjoin the construction of the ditch on the grounds that "it would cast large quantities of water and *debris* upon the right of way of the railroad company and upon the lands of the other" plaintiffs. (*Fenton & Thompson R.R. Co. v. Adams* (1906), 221 Ill. 201, 209, 77 N.E. 531.) The trial court ruled in favor of the defendants. This decision was affirmed on appeal.

Despite the fact that the "undisputed evidence of all the witnesses" revealed that "great quantities of water" would fall in the ditch in times of heavy rains making the stream "a veritable torrent" (*Fenton, supra,* at 214), the Court held that under *Peck* the dominant landowner could alter his property so long as the water that was discharged remained in the natural course of surface water drainage. The Court began by declaring:

> "As said in *Peck v. Herrington, supra,* quoting from *Kauffman v. Griesemer* 26 Pa.St. 407: 'Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenement for the discharge of all waters

which by nature rise in or flow or fall upon the superior," *Fenton, supra,* at 211,

and then went on to explain the exact nature of this easement with the following language:

"It is to be observed that the easement is not for the discharge upon the servient estate of all the waters which may flow from the dominant estate while the natural surface of the ground remains undisturbed, and not for the discharge of all the waters which may not be, by the natural depressions of the earth or natural obstructions to the waters' flow, retained upon the dominant heritage, but is for the discharge of '*all* waters which by nature rise in or flow or fall upon' the superior estate." *Fenton, supra,* at at 211-12.

Concerning the rate of flow and quantity of water that may be cast upon a servient tract because of alterations in a dominant tract the Court remarked:

"As long as the drainage results in carrying the water along the natural course the servient proprietor may not complain, even though natural barriers on the higher land have been cut down and the flow of water both accelerated and increased. Were the rule otherwise there would be no method by which any one owner could improve his land by the construction of ditches and drains which would carry the drainage upon another's property, because the purpose of such improvements in every instance is to hasten and increase the flow of water, and this object is only attained by the removal of natural barriers.

The fact, alone, therefore, that additional quantities of water will by the proposed new ditch be cast upon the lands of appellants does not establish the right to have the appellees enjoined from constructing that ditch." *Fenton, supra,* at 212-13.

██ *Fenton* thus stands for the proposition that the owner of a dominant tract can alter the condition of his land even if by doing so both the quantity of water and the rate at which it flows onto a servient tract in the natural course of drainage is thereby increased. It is important to stress that in *Fenton* the increased water flow was through the natural course of surface water drainage. The Court took care to note that if the dominant owner altered the condition of his land so that surface water was discharged in such a manner that it entered the property of the servient owner outside of the natural course of drainage, then the servient owner would have a cause of action.

"As said in *Daum v. Cooper, supra,* where the proprietor changes the natural course of the water he must restore the water to its

natural channel within the limits of his own land. He must not only do that, but he must also see that the water passes from his land upon the land of his neighbor at the precise place where it would naturally do so, and at no other place. He cannot empty it out of a ditch or drain into the natural channel in such quantities that it will overflow the natural channel and pass upon the lands of his neighbor at a place other than that at which it would naturally flow upon such lands, without becoming amendable." *Fenton, supra,* at 215.

The plaintiff has asserted that the Supreme Court's holding in *Hicks v. Silliman* (1879), 93 Ill. 255, is controlling. *Hicks* was an action for a permanent injunction brought by servient landowners against the owner of dominant property to prevent him from draining a 100 acre pond on his property by diverting the natural flow of a creek through certain ditches and trenches. (*Hicks, supra,* at 257-59.) In affirming the issuance of the injunction the Court stated that:

"[W]hile it is perfectly proper for the owner of land to use and cultivate it according to the ordinary methods of good husbandry, although by doing so it may interfere with the natural flow of surface water in passing over his own land, so as to increase or diminish the amount that would otherwise reach the land of an adjacent proprietor and thereby cause him an injury for which the law would afford no redress, yet such owner has no right, by the construction of ditches and embankments or other artificial structures of a similar character, to collect together the surface waters from his own lands or those of other persons, and precipitate them in undue and unnatural quantities upon the lands of his neighbor to his injury. (*Hicks, supra,* at 264.)

*Hicks* is neither inconsistent with *Peck* and the line of cases that follow it nor applicable to the facts of this case. We interpret the factual situation in *Hicks* to be a case where the dominant owner was draining his property outside the course of natural surface water drainage. This is contrary to the present case where there was no allegation that the defendants diverted the natural drainage course.

■■■ The plaintiff has filed an extensive brief in which he discusses at length cases from other jurisdictions that have adopted principles different from those set forth above. He has suggested that his problem is unique and, therefore, relief should be granted. Although we are mindful "that the doctrine of *stare decisis* is not an inflexible rule requiring this court to blindly follow precedents and adhere to policy decisions" (*Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill.2d 11, 26, 163 N.E.2d 89; see also *Nudd v. Matsoukas* (1956), 7 Ill.2d 608,

615, 131 N.E.2d 525; and *Doggett v. North American Life Insurance Co.* (1947), 396 Ill. 354, 360-61, 71 N.E.2d 686), we feel compelled to follow the rule adhered to by the courts of this State for over 75 years. We are also not persuaded that the plaintiff's situation is without precedent. In *City of Peru v. City of La Salle* (1970), 119 Ill.App.2d 211, 220, 255 N.E. 2d 502, the Court remarked:

> "In a municipal area surface water may be gathered, in absence of a physical watercourse, but such surface water can only be delivered to a point where in the state of nature it would have found its way down to the servient land. *When an area is subdivided or improved with houses or streets, the original conformation of the land may be changed, but if surface water flowing in the area is still drained into the same point of discharge where it would normally have found its way, the servient landowner cannot complain.*" (Emphasis added.)

Accordingly, the judgment in favor of defendants as to Counts I and II of the Complaint is affirmed, and the judgment dismissing Counts III and IV of the Complaint is affirmed.

Judgments affirmed.

CRAVEN, P. J., and SMITH, J., concur.