THE FENTON AND THOMPSON RAILROAD COMPANY *et al.*

*v.*

JOHN F. ADAMS *et al.*

*Opinion filed April 17, 1906.*

1. DRAINAGE—*right of owner of dominant estate to drain basin.* A land owner may deepen the depression in the rim of a natural basin on his land, through which the overflow naturally passes upon the land of another, so as to entirely drain the basin, provided the water is thereby discharged upon the servient estate at the same place as before, even though great quantities of water which would otherwise have remained in the basin are discharged upon the servient estate. (*Peck* v. *Herrington,* 109 Ill. 611, followed; inconsistent expressions in *Hicks* v. *Silliman,* 93 Ill. 255, overruled; *Dayton* v. *Drainage Comrs.* 128 Ill. 271, explained.)

2. SAME—*right of an owner to change water-course on his own land.* Where the natural course of water through the dominant estate is from a ravine to a basin and thence through a depression in the rim to the servient estate, the owner of the dominant estate may construct a ditch on his own land so as to cut out the basin and carry the water direct to the natural outlet upon the servient estate, even though debris which would otherwise have been carried to and remained in the basin is cast upon the servient estate.

3. SAME—*party changing a water-course must restore it within limits of his own land.* A party changing a natural water-course upon his own land must restore the water to its natural channel within the limits of his own land so that it will flow upon the servient estate at the same place as before, otherwise he is liable in damages to the owner of the servient estate.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Whiteside county; the Hon. FRANK D. RAMSAY, Judge, presiding.

A. A. WOLFERSPERGER, and L. T. STOCKING, for appellants:

That an injunction is the proper remedy to prevent the wrongful diversion of surface water is clearly established if the evidence shows that the proposed diversion of water

was wrongful, and that the damages which would be occasioned thereby would be continuing or often recurring and difficult of computation. *Graham* v. *Keene,* 143 Ill. 425; *Anderson* v. *Henderson,* 124 id. 164; *Hicks* v. *Silliman,* 93 id. 255; Gould on Waters, (2d ed.) secs. 276-506; Farnham on Waters and Water Rights, 2704.

The course of drainage cannot be changed. The owner of the higher lands has no right to open or remove natural barriers and let on to the lower land owner water which would otherwise not flow in that direction, and a ditch which casts water out of its course is a nuisance and may be abated as such. *Gillham* v. *Railroad Co.* 49 Ill. 484; *Graham* v. *Keene,* 143 id. 425; *Jewett* v. *Sweet,* 178 id. 96; *Dayton* v. *Drainage Comrs.* 128 id. 271; *Anderson* v. *Henderson,* 124 id. 164; *Lambert* v. *Alcorn,* 144 id. 313; *Young* v. *Highway Comrs.* 134 id. 569; *Daum* v. *Cooper,* 208 id. 391; *Mellor* v. *Pilgrim,* 3 Ill. App. 476; *Baker* v. *Leka,* 48 id. 353; *Burke* v. *Sanitary District,* 152 Ill. 133.

Surface water cannot be gathered together and cast in a body on the property of the lower owner in a manner it would not reach him in the regular channel. *Throop* v. *Griffin,* 77 Ill. App. 505; *Stoddard* v. *Filgur,* 21 id. 560; *Jacobson* v. *VanBoening,* 58 Am. St. Rep. 684; *Railroad Co.* v. *Morley,* 13 id. 482; *Patoka Township* v. *Hopkins,* 31 id. 417; Farnham on Waters and Water Rights, 965, 2578.

While it is proper for the owner of land to use and cultivate it according to the right modes of good husbandry, although by doing so it may interfere with the natural flow of surface water in passing over his own land so as to increase or diminish the amount that otherwise would reach the land of an adjacent property owner and thereby cause him an injury for which the law gives no redress, yet such owner has no right, by the construction of ditches and embankments or other artificial structures, to collect together the surface water from his own land or from that of other persons and precipitate it in undue and unnatural quantities upon the land

of his neighbor, and if he attempts to do so a court of equity will interpose to prevent it. *Hicks* v. *Silliman,* 93 Ill. 255.

A party has a right to increase the flow of water along its channel by artificial means if he does not divert it from its natural course. *Peck* v. *Herrington,* 109 Ill. 611; Farnham on Waters and Water Rights, 968-970; *Hicks* v. *Silliman,* 93 Ill. 255; Gould on Waters, secs. 271, 274, 268, 218a.

A land owner has no right to improve his lands by erecting dikes for their protection against ordinary floods in such a manner as to flood the lands of others which would otherwise be exempt from overflow. *Burke* v. *Sanitary District,* 152 Ill. 125.

The opening of an embankment of a railroad company cannot be controlled by injunction, so as to compel putting in openings for unusual and extreme floods. Farnham on Waters and Water Rights, 987, 988.

One about to erect a structure over a water-course is not bound to anticipate convulsions of nature or floods which have not previously been known to occur. Farnham on Waters and Water Rights, 1839, 1840; *Railroad Co.* v. *Bethel,* 11 Ill. App. 17; *Chicago* v. *Rustin,* 99 id. 47.

C. C. McMahon, for appellees:

Owners of land may drain the same in the general course of natural drainage by open drains, discharging into any natural water-course. 2 Starr & Cur. Stat. chap. 42, sec. 4.

Land may be redeemed by draining the same in the general course of natural drainage by constructing open drains, discharging into any natural water-course; and when such drainage is wholly upon the owner's land he shall not be liable in damages therefor to any person or persons or corporation. 2 Starr & Cur. Stat. chap. 42, sec. 4.

A land owner is entitled to change the course of a natural stream within the limits of his own land, provided that in so doing he does not cast on the land of an adjoining proprietor water which would not in the course of nature flow there-

on, and restores the stream to its original channel before such adjoining proprietor's land is reached. *Daum* v. *Cooper,* 208 Ill. 391; 2 Starr & Cur. Stat. chap. 42, sec. 4; *Palmer* v. *O'Donnell,* 15 Ill. App. 324.

The owner of a dominant heritage or higher tract of land has the right to have the surface water falling or coming naturally upon his premises, pass over the same through the natural drains upon and over the lower or servient lands; and the owner of a dominant heritage may, by ditches or drains, drain his own land into the natural and usual channel, even if the quantity of water thrown upon the servient heritage is thereby increased. *Peck* v. *Herrington,* 109 Ill. 611; *Throop* v. *Griffin,* 77 Ill. App. 505; *Anderson* v. *Henderson,* 124 Ill. 164; *Young* v. *Highway Comrs.* 134 id. 569; *Lambert* v. *Alcorn,* 144 id. 313; *Dayton* v. *Rutherford,* 128 id. 271; *Davis* v. *Highway Comrs.* 143 id. 9; *Totel* v. *Bonnefoy,* 123 id. 683; *Wilson* v. *Bondurant,* 142 id. 645; *Kankakee Drainage District* v. *Drainage District,* 130 id. 265.

Mr. Justice Scott delivered the opinion of the court:

The appellants filed a bill in the circuit court of Whiteside county against the appellees, seeking an injunction. Appellees answered and filed a cross-bill against the railroad company, likewise for an injunction. An answer was interposed to the cross-bill. Replications were filed, a hearing had on oral testimony before the chancellor in open court, and a decree entered dismissing the original bill for want of equity and awarding substantially the relief sought by the cross-bill. Complainants in the original bill, including the railroad company, which was defendant in the cross-bill, appealed to the Appellate Court for the Second District, and the decree being there affirmed, the record is now brought to this court for review.

In the summer of 1904 the Fenton and Thompson Railroad Company was engaged in constructing its road-bed upon its right of way, then recently acquired, across sections

13 and 24, in Fulton township, in the county of Whiteside. Coming from a northerly direction the road enters section 13 near the north-west corner thereof. It runs on a straight line east of south through these two sections and crosses the south line of section 24 near the south-east corner of that section. The land that it crosses near the center of section 24 is low, flat, bottom land. Something less than a mile east of this right of way across section 24, and running generally in a northerly and southerly direction, is a bluff which drains to the west. A little more than a half mile east of the center of section 24, and a quarter of a mile north of that point, a ravine comes out of the bluff, through which, in wet weather, a stream pours, draining the country for several miles to the east. As it comes out of this ravine it flows through a natural ditch on the land of appellant Akker in a north-westerly direction, crosses under a bridge (known in this litigation as bridge No. 1) on a highway which runs in an easterly and westerly direction near the north line of section 24, and the water, after passing upon section 13 through this ditch, first fills a basin 125 to 150 acres in extent in a natural state, being on the land of Akker and one Kustes in the east half of section 13, and on the land of appellee Adams in the west half of section 18, just over the town line to the east in Ustick township. When this basin is filled until it overflows, the water passes out of the basin on the land of Akker to the south-west and crosses the east and west highway at a place where there is a bridge, (known herein as bridge No. 2,) a little less than a half mile west of the place where the water crosses this highway when going north, and after crossing the highway, going south, it follows a natural depression, which has been slightly deepened by a ditch, and finally passes across the right of way of the railroad company near the center of section 24, and, following the depression, continues on south and west, on the west side of that right of way, across the lands of the appellants John Holleran and John Wolters. Other hollows, leading out of the bluff far-

ther north than the ravine above mentioned, also empty their waters into this basin. Except in very wet seasons and immediately following rains the ravine and these hollows are all dry.

Near the north line of section 13 Otter creek runs in a westerly direction. The surface of the water in Otter creek, at an ordinary stage, is higher than the bottom of the basin, and the bottom of the basin is higher than the point at which the depression crosses the right of way of the railroad company. On October 10, 1904, when the levels which appear in the record were taken, measuring from datum the elevation of the surface of the water in Otter creek, at the town line, was 81.46 feet. That of the left bank of the stream on the same line was 83.40 feet. The surface of the ground then sloped downward to the south to the bottom of the basin, where the elevation was 77.87 feet. Continuing toward the outlet of the basin the ground again rises, the elevation at the outlet being 79.09 feet. From there it slopes generally downward, with one or two slight rises in height, to where the depression reaches the right of way of the railroad company, where the elevation is 75.39 feet.

Akker owns the north-east quarter of section 24, the south half of the south-east quarter of section 13, in Fulton township, and the north-west quarter of section 19 in Ustick township. Adams owns the west half of section 18 in Ustick township, while Kustes owns the land lying between Akker's land, in section 13, and Otter creek.

In times of heavy rainfall the water pouring out of the ravine comes with great rapidity and in great quantities, carrying with it logs, brush, stumps and other *debris,* and deposits them in the basin. At such times large quantities of water are also poured into the basin from the territory directly east of it, and when Otter creek overflows its banks the water runs south across the land of Kustes and Adams to this same basin. Where the water flows out of the basin, crossing the highway at and near bridge No. 2, the fall is not

great and the current is not sufficient to carry the *debris* out of the basin, and it consequently remains there. The water which flows south across the highway at and near bridge No. 2 is in flood times a considerable stream. Several disinterested witnesses, who had long been residents of the vicinity, testified that they had on several occasions seen a stream flowing across there to the south ten or twelve rods in width, and belly-deep to a horse or hub-deep to a wagon.

In the present condition of the surface of the land, the basin not only retains large quantities of the *debris* which comes out of the ravine, but it also retains large quantities of water, owing to the fact that the ground at its outlet is practically two and one-half feet higher than the ground in its lowest portion. The water so retained passes away in dry times by seepage and evaporation, and never reaches the line of the railroad's right of way.

In the summer of 1904 Akker and Adams proposed to put a dam in the ditch just at the mouth of the ravine, and then dig an artificial ditch from the mouth of the ravine, above the dam, in a westerly direction, terminating in the depression, through which the water flows south, at a point twenty-three rods from the railroad's right of way. The purpose was to carry the water, which comes down the ravine, west, so that it would intersect the water-course shortly before it reached the right of way and prevent the water flowing north to or through the basin. The length of the proposed new ditch would be twenty-seven hundred feet and its fall from the east to the west would be about seventeen feet. Its width at the bottom was to be six feet, and at the top,—at least through the higher portion of the ground,—fifteen feet. At the same time the railroad company was about to build a solid earth embankment twenty feet in height across this bottom land, and, for the purpose of permitting the drainage to pass through, was about to place in the grade an iron pipe four feet in diameter, which was the only opening to be left through the grade. This pipe, however, was

not to be located at the point where the water naturally flows across the right of way, but at a point some fifty rods to the south-east, the purpose of the company being to carry the water, after it came upon the right of way, alongside its grade, south-east to this iron pipe. The drawing below will perhaps assist in arriving at a correct understanding of the situation:

On September 19, 1904, appellants filed their bill seeking to enjoin the construction of the proposed new ditch, charging that it would cast large quantities of water and *debris* upon the right of way of the railroad company and upon the lands of the other appellants, which, but for said proposed ditch, would be carried into the basin, where the *debris* would remain, and where large quantities of water would evaporate and seep away and never reach the right of way of the railroad company or the lands of the other appellants at all; that the effect of the proposed new ditch would be to greatly damage and endanger the grade and track of the railroad company, and if the water could find a way across the right of way it would ruin the lands of the other appellants, flooding the same and depositing thereon great quantities of sand, brush and other rubbish. The bill further stated that in seasons of great rainfall some water would flow out of the basin and down the course heretofore outlined to the right of way of the railroad company and the farms of the other appellants, but stated that as that water flowed south from the basin it spread out over land which was almost level, forming a very wide and shallow stream, moving south very slowly, seeping away and evaporating as it went, and that the iron pipe which the railroad company expected to lay under its grade would easily care for and carry off all the water that would reach there. Appellees answered, substantially admitting the material averments of fact contained in the bill, except they denied that the iron pipe would be sufficient to care for the drainage that now flows to the right of way, and denied that the proposed new ditch would visit any unlawful damage upon appellants, and averred that such ditch would be wholly upon the land of Akker, and showed that while the ditch would in the first instance take the water out of its natural course, yet that it would return it to that natural course at a point on the land of Akker.

The defendants in the original bill then filed their cross-bill against the railroad company, charging that the railroad

221—14

company was about to construct the large embankment above mentioned, leaving no culvert or opening whatever in the natural course of the water, but locating the iron pipe as above mentioned; averring that the consequence would be that large bodies of stagnant water would remain for indefinite periods upon the land of appellees, rendering their lands comparatively worthless and the locality unsanitary, and praying an injunction against the railroad company restraining it from filling up said water-way and compelling it to leave a way for the water through its grade where the natural course of the water passes across the right of way, which way for the water through the grade should be of the width of fifty feet and of the height of the proposed embankment. The answer of the company substantially follows the theory of the bill, and denies that appellees are entitled to the relief asked by their cross-bill.

As heretofore stated, the chancellor, upon the hearing, dismissed the original bill for want of equity, and enjoined the railroad company from grading or filling in with earth or other material the natural water-course across its right of way in any manner that will cause an obstruction to the free flow of water, and requiring it to leave a passage for the water at least forty feet in width, measured along the line of the proposed grade, and the opening to extend upward fifteen feet from the natural surface of the ground.

In *Peck* v. *Herrington,* 109 Ill. 611, the conclusion is reached that the owner of a dominant heritage may, by ditches or drains, drain his own land into the natural or usual water-course, even if the quantity of water thrown upon the servient heritage is thereby increased; and the right of Peck to drain water out of ponds and cause it to flow upon the land of Herrington along the natural course of the water was expressly recognized, where, had the drain not been put in, the water would have remained in the ponds until it seeped away or evaporated, and never would have flowed upon the lands of Herrington. From this case, and the nu-

merous cases which have followed it, the law deduced is this: If an owner have upon his land when the surface is in its natural state, a basin in which water accumulates, and from which, when filled and overflowing, the water passes in a particular place where the rim of the basin is lower than elsewhere, and then flows through a depression to and upon the land of another, the natural outlet and natural course for that water is through that low place in the rim and through that depression, and the owner may lawfully cut down the rim and deepen the depression upon his own land so as to entirely drain the basin and cause the water therefrom to pass through the depression to and upon the land of his neighbor, if the neighbor's land be low enough to entirely drain the basin, even though the amount of water flowing through this depression to the servient heritage is thereby increased, and water which would be retained in the basin if the rim and depression were left as in a state of nature and never reach the land of the neighbor, is thereby cast upon his heritage. It follows, therefore, that Akker would have the right to so deepen the natural course leading from the basin to the railroad's right of way as to entirely drain that basin, and cast all its water, except such as disappears by percolation and evaporation while flowing through the drain, upon the property of the railroad company, although it is apparent that in so doing he would pour large quantities of water upon the right of way which in a state of nature must remain in the basin. As said in *Peck* v. *Herrington, supra,* quoting from *Kauffman* v. *Griesemer,* 26 Pa. St. 407: "Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenement for the discharge of all waters which by nature rise in or flow or fall upon the superior." It is to be observed that the easement is not for the discharge upon the servient estate of all the waters which may flow from the dominant estate while the natural surface of the ground remains undisturbed, and not for the discharge of all

the waters which may not be, by the natural depressions of the earth or natural obstructions to the waters' flow, retained upon the dominant heritage, but is for the discharge of "*all* waters which by nature rise in or flow or fall upon" the superior estate.

Appellants rely upon a number of cases decided by this court subsequent to *Peck* v. *Herrington, supra,* an examination of which discloses that where the right of drainage has been denied it has been because the owner of the higher land has sought to drain upon the lower land water whose natural course did not lead to that land,—where, as to that particular water, the higher land and lower land did not sustain the relation of dominant and servient estate. Particular reliance is placed upon identical language found in several of these authorities, and which we quote from *Dayton* v. *Drainage Comrs.* 128 Ill. 271, as follows: "But the owner has no right to open or remove natural barriers and let on to such lower lands water which would not otherwise naturally flow in that direction. That would subject the servient heritage to an unreasonable burden, which the law will not permit, and against which the owner ought reasonably to have protection." The meaning of this language, when applied to this case, is simply this: The owners of the land on which this basin is located would have no right to cut through the rim at some place other than the lowest point therein, and thereby drain the water upon the land of another which is not reached by the course which the water follows when it overflows naturally. As long as the drainage results in carrying the water along the natural course the servient proprietor may not complain, even though natural barriers on the higher land have been cut down and the flow of water both accelerated and increased. Were the rule otherwise there would be no method by which any one owner could improve his land by the construction of ditches and drains which would carry the drainage upon another's property, because the purpose of such improvements in every instance is

to hasten and increase the flow of water, and this object is only attained by the removal of natural barriers.

Appellants also urge upon our attention the case of *Hicks* v. *Silliman,* 93 Ill. 255, and we are of the opinion that language is used in that case that is somewhat inconsistent with *Peck* v. *Herrington, supra,* and the many cases which follow, and in so far as such inconsistency exists the earlier case must yield to the later ones.

The fact, alone, therefore, that additional quantities of water will by the proposed new ditch be cast upon the lands of appellants does not establish the right to have the appellees enjoined from constructing that ditch.

In *Daum* v. *Cooper,* 208 Ill. 391, we said: "A proprietor of land may change the course of a natural water-course within the limits of his own land if he restores it to the original channel before the lands of another are reached, provided in changing the course of the stream he does not cast upon the lands of an adjoining proprietor water which would not in a course of nature flow upon such adjoining premises." In that case there was before the court no question as to what water or what amount of water the owner of the dominant heritage was seeking to cast upon the land of his neighbor, and the expression "water which would not in a course of nature flow upon such adjoining premises," means water the natural way of which does not lead upon such adjoining premises, and not water which, though naturally draining through a course which leads to the servient heritage, would not reach there except for the change in the channel of the stream.

The proposed new ditch is wholly upon the land of Akker. It takes the water from the ravine and by a short cut empties it again into the natural course of that water, thereby obviating the necessity of the water flowing northerly into the basin and such portions of it as are not there retained flowing southerly past bridge No. 2 to the point where the new ditch will intersect its natural channel. It

is true that a part of this water, in following its natural course, flows upon land other than that owned by Akker, namely, the land of Adams and the land of Kustes. They, or either of them, possess the right to have the water continue to flow into the basin, but as Adams joins with Akker in this enterprise and Kustes makes no objection it is unnecessary to consider their right to object. The matter was therefore properly disposed of by the circuit court on precisely the same basis that it would have been had it appeared that in following its natural course the water from the ravine never passed off the land of Akker until it passed upon the land of the appellant railroad company.

Another objection urged to the decree with great vehemence is, that it is unjust for the reason that the new ditch will carry down to the lands of appellants brush and other *debris* that never could reach there if the water followed the natural course. Any drain that accelerates the flow of water will increase the amount of solid matter that it carries to the servient estate, and we do not think it is a good objection to the exercise of the right of a dominant proprietor to say that the increased flow will carry *debris* beyond the boundary line which would not reach there except by reason of the artificial drainage.

We are satisfied that appellees were entirely within their right, as fixed by the decisions of this State, in seeking to shorten the course of this water from the mouth of the ravine to the place where it would naturally reach the railroad's right of way. We would have been better satisfied with the decree, however, had it been different in one respect. The proposed new ditch will have a fall of seventeen feet in a little more than a half mile. By the undisputed evidence of all the witnesses great quantities of water will pour down there in times of heavy rains, and the amount of fall in the ditch will make the stream a veritable torrent. The mouth of the ditch is but twenty-three rods from the line of the railroad company's property, and from the mouth west and

south-west to the right of way the surface of the ground is almost level and to the south it slopes but a little along the natural water-way. It would seem to us probable that this ditch, emptying there in that manner, would cause the water conducted by it to flow in great quantities upon the right of way and against the railroad grade north of the place where the natural course of the water intersects the line of the railroad property. As said in *Daum* v. *Cooper, supra,* where the proprietor changes the natural course of the water he must restore the water to its natural channel within the limits of his own land. He must not only do that, but he must also see that the water passes from his land upon the land of his neighbor at the precise place where it would naturally do so, and at no other place. He cannot empty it out of a ditch or drain into the natural channel in such quantities that it will overflow the natural channel and pass upon the lands of his neighbor at a place other than that at which it would naturally flow upon such lands, without becoming amenable. It seems to us, from the evidence contained in this record, that the decree would have been more equitable had it provided that from a point on the line of the proposed ditch at least eighty rods distant from the right of way of the railroad company the ditch should be constructed on a direct line to a point where it would lead into the natural course within a few feet of the place where that course passes upon the right of way. Had this been done it would have insured the water emptying out of the ditch and passing upon the railroad company's property through the natural channel and just at the opening which the company is required by the decree to leave in its grade. On the trial of the cause, however, defendants offered to construct their proposed ditch to the railroad right of way so that it would lead to and through a culvert to be constructed by the company. This offer appellants refused. Had it been accepted the difficulty of which we speak would have been obviated and we think the rights of all parties would thereby have been properly

conserved. We cannot reverse the decree for the purpose of permitting the appellants to obtain relief which they refused to accept when it was offered them on the original trial in the circuit court.

Appellees' obligation, however, to pour this water upon the land of the railroad company at no other place than that at which the water naturally flows upon that land is not, by the decree which has been rendered herein, in anywise lessened or changed. If the water from this ditch, when it is completed, passes upon the land of the railroad company at any such other place, appellees will be liable in damages, and appellees may then, in other proceedings, be restrained from maintaining the ditch in such manner as that it will pour water upon the right of way of the Fenton and Thompson Railroad Company at any place other than that at which the water from the basin naturally passes upon that right of way.

The appellants complain bitterly of the onerous burdens which the decree in this case casts upon them, but they are only such as accompany the ownership of servient estates.

The judgment of the Appellate Court and the decree of the circuit court will be affirmed.    *Judgment affirmed.*