## MAGNOLIA APARTMENTS, INC. v. P. HUBER HANES, JR.

### No. 7021SC339

(Filed 24 June 1970)

1. **Waters and Watercourses § 1— saturation of soil — diversion of surface waters — sufficiency of evidence**

   Plaintiff landowner whose apartment buildings and parking lot had become settled by the saturation of the underlying soil with water failed to offer sufficient evidence to support its allegations that defendant, through the grading of his property, diverted surface waters from their natural flow and caused them to seep through the ground, thereby saturating the soil on plaintiff's land; plaintiff's evidence that the fill work on defendant's property increased the flow of water toward plaintiff's land does not justify recovery, where the water flowed to the same place as before the fill work.

2. **Waters and Watercourses § 1— increase in flow of water**

   Although neither a corporation nor an individual can direct water from its natural course so as to damage another, they may increase and accelerate its flow.

3. **Waters and Watercourses § 1— increase in flow of water — duty of lower estates**

   It is the duty of the owners of the lower estates to receive and allow passage of the increased flow of water from the higher estates so long as the flow has not been diverted from its natural course.

4. **Waters and Watercourses § 1— saturation of soil — accumulation of water on defendant's land — stopping up of artificial conduits**

   Plaintiff landowner whose apartment buildings and parking lot had become settled by the saturation of the underlying soil with water failed to prove that its loss was occasioned by the large accumulation of water on the defendant's property and that this accumulation resulted from the stopping up of artificial conduits, none of which were located on defendant's land, by fill material used by defendant on his land.

APPEAL by plaintiff from Order of *Exum, J.,* at the 5 January 1970 Session of FORSYTH County Superior Court.

Plaintiff instituted this civil action on 30 January 1968, alleging in its complaint that defendant had wrongfully diverted surface water from his land onto plaintiff's land, causing damage to an apartment building and parking lot located thereon. Defendant answered denying that there had been any diversion, and alleging that the damage complained of, if it had occurred at all, resulted from plaintiff's own negligence.

The evidence presented shows that in 1959 plaintiff acquired a tract of land on the north side of Northwest Boulevard near the intersection of Northwest Boulevard and West First Street in Winston-Salem. Three apartment buildings, which had been constructed prior to 1959, were located on the land. The land is bordered on the north by a Southern Railway Systems, Inc. (Railway) right-of-way some 100 feet wide. A railroad track elevated some 30 to 40 feet and running generally east and west is maintained on the right-of-way.

A tract of land of approximately 16½ acres, acquired by defendant in June of 1964, lies immediately north of the railway right-of-way. Defendant's tract, triangular in shape, is bordered along the west margin by Miller Street, and along the east margin by West First Street, with the railway right-of-way as its southern boundary. The property slopes generally from its apex in the north toward plaintiff's property on the south. The higher elevations are on the north central portions of the acreage and the lower elevations are at the southern margin which adjoins the railway right-of-way. Thus, according to the natural lay of defendant's land, the tract slopes generally southwardly from West First Street to the railway right-of-way. A 24-inch cast-iron drain pipe runs underneath the railroad embankment to plaintiff's land for the purpose of "carrying off" the surface water flowing naturally toward the right-of-way from defendant's property. Before the apartments were constructed on the property purchased by plaintiff, a natural drainage ditch or gulley carried the surface water from the drainage pipe across the property.

In order to construct the apartment buildings, extensive filling was necessary. The filling covered the lower, or southerly, draining end of the 24-inch drain pipe. A 15-inch terra cotta pipe was connected to the southern end of the 24-inch pipe and this 15-inch pipe was carried through the filled land on the tract now owned by plaintiff and connected to large storm drains south of the property. Apartment Building No. 1 was then constructed over the 15-inch pipe. All of this work was done by plaintiff's predecessor in title.

In 1963 plaintiff added more fill dirt under Apartment Building No. 1 and tampered it with a hydraulic tamper in an effort to correct certain sagging and settling about the eastern end of Apartment Building No. 1 and to prevent future settling. I-beams were then installed and 25 cubic yards of concrete, reinforced with steel, was poured under the building on top of the tampered soil. At that time, the dirt under the building was dry, and the 15-inch terra cotta pipe was intact.

In late 1964 and early 1965, plaintiff observed water coming through the brick and block retaining wall at the base of the railroad right-of-way. The asphalt parking lot between Apartment Buildings Nos. 1 and 2 began to deteriorate with small water geysers appearing in the cracks that formed on the lot. A concrete walk in the vicinity collapsed. Upon excavation, a large void was found very near the eastern end of Apartment Building No. 1, and the ground in the entire area was saturated with water. Several witnesses reported seeing the 15-inch terra cotta pipe exposed in two places. A 4 to 6 foot section between the two exposed ends was missing. Witnesses also noted that the concrete placed under Apartment Building No. 1 in 1963 had a 2 to 3 foot void under it, and the soil underneath the void was saturated with water. Plaintiff installed jacks under the building and jacked the building to its original position. More concrete was poured to set the jacks. Mr. George Sparks, a grading and draining contractor, was employed by plaintiff in an attempt to remedy the situation. He constructed a new storm drainage system around Apartment Building No. 1, placing a manhole at the southern end of the 24-inch pipe, running a new 36-inch pipe from there to another manhole, and then out to the storm drains south of plaintiff's tract on Northwest Boulevard.

Sparks had also done some fill work on defendant's tract of land in late 1964 and the early spring of 1965. Prior to this time, defendant's tract had trees and a heavy growth of vines, grass, weeds, and other vegetation growing upon it. Most of the timber and much of the other vegetation was completely removed from the tract during the filling process. The surface water runoff was increased by the loss of vegetation, and more surface water started accumulating on the southern border of defendant's property in the area where the 24-inch cast-iron pipe ran under the railroad right-of-way. Before the fill work was begun, the area immediately surrounding the northern intake of the 24-inch pipe had been damp and marshy. After the fill work, water collected there in larger amounts. This accumulation amounted to as much as an acre in size with depths at times of from 5 to 7 feet.

There was testimony that this large accumulation of water resulted because much of the flow of water was not being carried through the artificial conduits to the storm drains south of plaintiff's property. In 1965, when it was discovered that the terra cotta pipe was broken, it was also discovered that it was completely stopped up with dirt, mud and broken pipe.

Several expert witnesses were called to verify the soil conditions found under the plaintiff's apartment building. They gave their opinions as to how the accumulated water on defendant's property had created a "flow" to plaintiff's property and the reasons why this flow saturated the soil and caused the settling of the building and parking lot. The testimony of William I. Bigger, a consulting engineer, is illustrative. He testified that in his opinion the accumulation of water on defendant's land north of the elevated railroad could have caused the saturated condition beneath plaintiff's parking lot and the other conditions about which plaintiff complains. He based his opinion on the following theory: The soil on both sides of the railroad contains high degrees of porous silts and sands. When materials such as these have water impounded upon them on one side of an embankment higher than the ground level or water level on the lower side, the weight of the impounded water pushes lower lying levels of water into the pores of the silts and sands and causes a "flow net" or "flow lines" to develop through the soil on both sides of the embankment and underneath or through the embankment itself. The pressure of the water on the higher side, through pressure of the flow net, creates pressure on the water on the lower side and causes it to rise. When the upward force of the water on the lower side reaches a point where it is greater than the downward force of the soil over it a condition results known as "boiling" and the water actually bubbles out of the ground, occasionally having the appearance of a small geyser.

At a pretrial conference, both parties entered into certain stipulations and issues to be determined were submitted by both parties, both agreeing that the first issue would be the question of wrongful diversion of surface waters upon defendant's land.

At the end of the plaintiff's evidence, defendant's motion for a directed verdict was granted. Plaintiff appealed.

*Randolph and Randolph by Clyde C. Randolph, Jr., for plaintiff appellant.*

*Deal, Hutchins and Minor by John M. Minor and Philip B. Whiting for defendant appellee.*

GRAHAM, J.

The only question on this appeal is whether the evidence, taken in the light most favorable to plaintiff and giving to it the benefit of every reasonable inference which can be drawn therefrom was sufficient to withstand defendant's motion for a directed verdict. (See *Musgrave v. Mutual Savings and Loan Association*, filed in this court on this date).

[1] The theory of plaintiff's complaint is that defendant, through the grading of his property, diverted surface waters from their natural flow and caused them to seep through the ground at the railway right-of-way, saturating the soil on plaintiff's land and causing the damages alleged. The parties do not disagree over the general principle that owners of land on the higher level cannot lawfully divert the surface water or interfere with its natural flow by artificial obstruction or device so as to injure the premises of a servient owner. *Bradley v. Texaco, Inc.*, 7 N.C. App. 300, 172 S.E. 2d 87, and cases therein cited. However, we find no evidence here that there was a diversion of surface water. It is true that the fill work on defendant's property increased the flow of water toward plaintiff's land, but the water flowing across defendant's land after the fill work flowed to the same place that the water flowed before the fill work. The testimony of George Sparks clearly established this fact and there was no evidence to the contrary. He stated:

"There has been no grading on the 16.5 acres. All we have done is fill. Before we did anything, the rain which fell on this property went under the railroad. And that means the area up at the apex, where Miller and First came along together, the rain which fell on it in the First Street area, all along up Miller street, *all the rain that fell on that 16.5 acre property, all the rain that fell on that property was funneled and drained through the 24-inch line.*

Before we did any work out there on the Hanes property on the railroad side, they had a drainage come in from each way, and the drainage from First Street all of it settled right in that area at the 24-inch line and on the Hanes property. And that was a marshy area. You take you have got a drain coming from Miller Street that goes in there, on the same side of the 16 acres we are talking about, and then you also got a drain, a storm drain system, came from First Street back in there.

All draining water right down towards this 24-inch line. And that created a marshy area right at the mouth of the 24-inch line. It was that way when I started working on it. Nor many years back, I can't state that, but it was that way when I started working on it in 1964. It is labeled 'marshy' in the other diagram. The Hanes property formed sort of a dropping funnel from all sides down towards this 24-inch line.

\*          \*          \*

I have shown there by my arrows on the other diagram that the drainage from the intersection of Miller Street and the railroad, in the southwestern corner of the 16 acre tract, *that drainage, before I did anything to the property, was down toward, and in the direction of, the 24-inch line under the railroad.* And the drainage from the corner, or the intersection of First Street and the railroad, in the southeastern corner, was in a westerly direction toward the 24-inch line. And it is still there yet, and anybody can look at it." (Emphasis added).

[2]     It is well established that while neither a corporation nor an individual can divert water from its natural course so as to damage another, they may increase and accelerate its flow. *Rice v. Railroad*, 130 N.C. 375, 41 S.E. 1031; *Davis v. Cahoon*, 5 N.C. App. 46, 168 S.E. 2d 70. In the case of *Davis v. R. R.*, 227 N.C. 561, 42 S.E. 2d 905, we find the following at pages 565, 566:

" '. . . As long as the drainage results in carrying the water along the natural course the servient proprietor may not complain, even though natural barriers on the higher land have been cut down and the flow of water both accelerated and increased. Were the rule otherwise, there would be no method by which any one owner could improve his land by the construction of ditches and drains which would carry the drainage upon another's property, because the purpose of such improvement in every instance is to hasten and increase the flow of water, and this object is only attained by the removal of natural barriers.' *Fenton & Thompson R. Co. v. Adams*, 211 Ill., 201, 77 N.E., 531, 535.

If the owner of adjacent property on a high level were not permitted to prepare his property for any legitimate purpose to which it might be put by leveling it or clearing it or other improvement, on the theory that he had no right to accelerate the flow of water therefrom but must leave it as an absorbent to retard its flow, it would deprive such owner of the use of his property."

**[1]**  It is our opinion, and we so hold, that plaintiff's evidence was insufficient to establish a diversion of surface water by defendant as alleged in the complaint.

However, plaintiff now asserts a right of recovery under a theory different from that arising on the pleadings.

**[3, 4]**  It is now argued that the cause of plaintiff's damage was the accumulation of the large volume of water on defendant's 16.5 acre tract of land, and substantial authority is cited to support the general principle that every person may make reasonable use of his own property but may not use it in a manner which injures others. Conceding *arguendo* that under the Rules of Civil Procedure (G.S. 1A-1 *et seq.*), effective 1 January 1970, defendant was not entitled to a directed verdict on the grounds of fatal variance between plaintiff's allegations and proof (See Rule 15(b)), we are nevertheless of the opinion that the evidence fails to support a right of recovery under any theory. For instance, there was no evidence to show that the large accumulation of water was caused by any action on the part of defendant. It is true that the flow of water accelerated after the fill work was done on defendant's land, and it was after the work had been completed when the large accumulations of water were noticed. But defendant had the right to accelerate the flow, and it was the duty of the owners of the lower estates to receive and allow passage of the increased flow of water so long as it had not been diverted from its natural course. In the case of *Mizzell v. McGowan*, 120 N.C. 134, 26 S.E. 783, plaintiff sought recovery for flood damages to his property. The flooding was allegedly caused when defendants constructed drainage canals over their property, causing the waters to flow from their land with more force and rapidity than the natural flow. The Supreme Court held that it was error for the trial court to refuse to give unqualified jury instructions to the effect that defendants had the right to make canals for the purpose of draining their land of the water naturally falling thereon, although in so doing the flow of water was increased on plaintiff's land. In speaking of the duties of a servient property owner the court stated:

> "The surface of the earth is naturally uneven, with inequality of elevation. The upper and lower holdings are taken with a knowledge of these natural conditions, and the privilege or easement of the upper tenant to carry off the surface water in its natural course, under reasonable limitations, and the subserviency of the lower tenant to this easement are the natural incidents to the ownership of the soil. The lower surface is doomed by nature to bear this servitude to the superior and

*must receive the water that falls on and flows from the latter.*" (Emphasis added).

The accumulation of the large amount of water, according to any interpretation of the evidence, resulted from the inability of the artificial conduits, none of which was located on defendant's land, to receive and allow passage of the water. Plaintiff contends that this inability resulted from the fill material used by defendant washing into and stopping up the 24-inch pipe and the 15-inch terra cotta pipe. The only evidence directly relating to the cause of this stoppage was that of witness Sparks. He stated:

"At the time I cut into this 24-inch pipe underneath the railroad, there was mud in the pipe. It was completely filled up, blocked at this end.

\* \* \*

When this 24-inch line was blocked in here (the witness pointed to the eastern portion of the 24-inch line), it just backed the water and the settlements all the way through the line. It couldn't drain out because the 15-inch line was broke and the dirt fell in all the way through and blocked the line."

If, as plaintiff's witness Sparks testified, the breakage in the terra cotta pipe caused the stoppage and the resulting "ponding" of water on defendant's property, defendant cannot be held responsible, absent a showing that in some manner he caused the terra cotta pipe to break. There is no such showing.

Affirmed.

MALLARD, C.J., and MORRIS, J., concur.